# EXHIBIT E

```
<DOCUMENT>
<TYPE>SB-2
<SEQUENCE>1
<FILENAME>v018756_sb2.txt
<TEXT>
```

As filed with the Securities and Exchange Commission on May 20, 2005
An Exhibit List can be found on page II-7.
Registration No. 333-

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

------------------------------

FORM SB-2
REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933

------------------------------

CYBERLUX CORPORATION
(Name of small business issuer in its charter)

| Nevada | 3674 | 91-2048178 |
|---|---|---|
| (State or other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

4625 Creekstone Drive, Suite 100
Research Triangle Park
Durham, North Carolina 27703
(919) 474-9000
(Address and telephone number of principal executive offices and
principal place of business)

Don F. Evans, Chief Executive Officer
CYBERLUX CORPORATION
4625 Creekstone Drive, Suite 100
Research Triangle Park
Durham, North Carolina 27703
(919) 474-9000
(Name, address and telephone number of agent for service)

Copies to:
Gregory Sichenzia, Esq.
Sichenzia Ross Friedman Ference LLP
1065 Avenue of the Americas, 21st Flr.
New York, New York 10018
(212) 930-9700
(212) 930-9725 (fax)

APPROXIMATE DATE OF PROPOSED SALE TO THE PUBLIC:
From time to time after this Registration Statement becomes effective.

If any securities being registered on this Form are to be offered on a delayed
or continuous basis pursuant to Rule 415 under the Securities Act of 1933, other
than securities offered only in connection with dividend or interest
reinvestment plans, check the following box: [X]

If this Form is filed to register additional securities for an offering pursuant
to Rule 462(b) under the Securities Act, check the following box and list the
Securities Act registration statement number of the earlier effective
registration statement for the same offering. _____

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under
the Securities Act, check the following box and list the Securities Act
registration statement number of the earlier effective registration statement
for the same offering. _____

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. _____

If delivery of the prospectus is expected to be made pursuant to Rule 434, please check the following box. _____

<PAGE>

<TABLE>
<CAPTION>

CALCULATION OF REGISTRATION FEE

| Title of each class of securities to be registered | Amount to be registered (1) | Proposed maximum offering price per share (2) | Proposed maximum aggregate offering price | Amou registr |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | |
| Common stock, $.001 par value issuable upon conversion of Secured Convertible Notes | 150,000,000 (3) | $.02 | $3,000,000 | |
| Common Stock, $.001 par value issuable upon exercise of Warrants | 25,000,000 (4) | $.03 | $750,000 | |
| Total | 175,000,000 | | $3,750,000.00 | |

</TABLE>

(1) Includes shares of our common stock, par value $0.001 per share, which may be offered pursuant to this registration statement, which shares are issuable upon conversion of secured convertible notes and the exercise of warrants held by the selling stockholders. In addition to the shares set forth in the table, the amount to be registered includes an indeterminate number of shares issuable upon conversion of the secured convertible notes and exercise of the warrants, as such number may be adjusted as a result of stock splits, stock dividends and similar transactions in accordance with Rule 416. The number of shares of common stock registered hereunder represents a good faith estimate by us of the number of shares of common stock issuable upon conversion of the secured convertible notes and upon exercise of the warrants. For purposes of estimating the number of shares of common stock to be included in this registration statement, we calculated a good faith estimate of the number of shares of our common stock that we believe will be issuable upon conversion of the secured convertible notes and upon exercise of the warrants to account for market fluctuations, and antidilution and price protection adjustments, respectively. Should the conversion ratio result in our having insufficient shares, we will not rely upon Rule 416, but will file a new registration statement to cover the resale of such additional shares should that become necessary. In addition, should a decrease in the exercise price as a result of an issuance or sale of shares below the then current market price, result in our having insufficient shares, we will not rely upon Rule 416, but will file a new registration statement to cover the resale of such additional shares should that become necessary.

(2) Estimated solely for purposes of calculating the registration fee in accordance with Rule 457(c) and Rule 457(g) under the Securities Act of 1933, using the average of the high and low price as reported on the Over-The-Counter Bulletin Board on May 19, 2005, which was $.02 per share.

(3) Includes a good faith estimate of the shares underlying secured convertible notes to account for market fluctuations.

(4) Includes a good faith estimate of the shares underlying warrants exercisable at $.03 per share to account for antidilution protection adjustments.

----------

Accordingly, we have received a total of $600,000 pursuant to the Securities Purchase Agreement.

The secured convertible notes bear interest at 10%, mature three years from the date of issuance, and are convertible into our common stock, at the selling stockholders' option, at the lower of (i) $0.03 or (ii) 50% of the average of the three lowest intraday trading prices for the common stock on a principal market for the 20 trading days before but not including the conversion date. Accordingly, there is in fact no limit on the number of shares into which the notes may be converted. As of May 20, 2005, the average of the three lowest intraday trading prices for our common stock during the preceding 20 trading days as reported on the Over-The-Counter Bulletin Board was $.02 and, therefore, the conversion price for the secured convertible notes was $.01. Based on this conversion price, the $1,500,000 secured convertible notes, excluding interest, were convertible into 150,000,000 shares of our common stock.

AJW Partners, LLC, AJW Qualified Partners, LLC, AJW Offshore, Ltd. and New Millennium Partners II, LLC have contractually agreed to restrict their ability to convert or exercise their warrants and receive shares of our common stock such that the number of shares of common stock held by them and their affiliates after such conversion or exercise does not exceed 4.9% of the then issued and outstanding shares of common stock.

See the "Selling Stockholders" and "Risk Factors" sections for a complete description of the secured convertible notes.

4

<PAGE>

## RISK FACTORS

This investment has a high degree of risk. Before you invest you should carefully consider the risks and uncertainties described below and the other information in this prospectus. If any of the following risks actually occur, our business, operating results and financial condition could be harmed and the value of our stock could go down. This means you could lose all or a part of your investment.

Risks Relating to Our Business:

We Have a History Of Losses Which May Continue, Which May Negatively Impact Our Ability to Achieve Our Business Objectives.

We incurred net losses of $6,025,848 for the year ended December 31, 2004 and $1,494,556 for the year ended December 31, 2003. For the three months ended March 31, 2005, we incurred a net loss of $423,660. We cannot assure you that we can achieve or sustain profitability on a quarterly or annual basis in the future. Our operations are subject to the risks and competition inherent in the establishment of a business enterprise. There can be no assurance that future operations will be profitable. Revenues and profits, if any, will depend upon various factors, including whether we will be able to continue expansion of our revenue. We may not achieve our business objectives and the failure to achieve such goals would have an adverse impact on us.

If We Are Unable to Obtain Additional Funding Our Business Operations Will be Harmed and If We Do Obtain Additional Financing Our Then Existing Shareholders May Suffer Substantial Dilution.

We will require additional funds to sustain and expand our sales and marketing activities. We anticipate that we will require up to approximately $900,000 to fund our continued operations for the next twelve months, depending on revenue from operations. Additional capital will be required to effectively support the operations and to otherwise implement our overall business strategy. There can be no assurance that financing will be available in amounts or on terms acceptable to us, if at all. The inability to obtain additional capital will restrict our ability to grow and may reduce our ability to continue to conduct business operations. If we are unable to obtain additional financing, we will likely be required to curtail our marketing and development plans and possibly cease our operations. Any additional equity financing may involve substantial dilution to our then existing shareholders.

Our Independent Auditors Have Expressed Substantial Doubt About Our Ability to

Continue As a Going Concern, Which May Hinder Our Ability to Obtain Future
Financing.

In their report dated March 17, 2005, our independent auditors stated
that our financial statements for the year ended December 31, 2003 were prepared
assuming that we would continue as a going concern. Our ability to continue as a
going concern is an issue raised as a result of losses for the years ended
December 31, 2004 and 2003 in the amounts of $6,025,848 and $1,494,556,
respectively. We continue to experience net operating losses. Our ability to
continue as a going concern is subject to our ability to generate a profit
and/or obtain necessary funding from outside sources, including obtaining
additional funding from the sale of our securities, increasing sales or
obtaining loans and grants from various financial institutions where possible.
Our continued net operating losses increase the difficulty in meeting such goals
and there can be no assurances that such methods will prove successful.

If We Are Unable to Retain the Services of Messrs. Evans, Schmidt or Ringo, or
If We Are Unable to Successfully Recruit Qualified Managerial and Sales
Personnel Having Experience in Business, We May Not Be Able to Continue Our
Operations.

Our success depends to a significant extent upon the continued service
of Mr. Donald F. Evans, our Chief Executive Officer, Mr. Mark D. Schmidt, our
President and Mr. John Ringo, our Secretary and Corporate Counsel. Loss of the
services of Messrs. Evans, Schmidt or Ringo could have a material adverse effect
on our growth, revenues, and prospective business. We do not maintain key-man
insurance on the life of Messrs. Evans or Ringo. In addition, in order to
successfully implement and manage our business plan, we will be dependent upon,
among other things, successfully recruiting qualified managerial and sales
personnel having experience in business. Competition for qualified individuals
is intense. There can be no assurance that we will be able to find, attract and
retain existing employees or that we will be able to find, attract and retain
qualified personnel on acceptable terms.

                                       5

<PAGE>

Many Of Our Competitors Are Larger and Have Greater Financial and Other
Resources Than We Do and Those Advantages Could Make It Difficult For Us to
Compete With Them.

The lighting and illumination industry is extremely competitive and
includes several companies that have achieved substantially greater market
shares than we have, and have longer operating histories, have larger customer
bases, and have substantially greater financial, development and marketing
resources than we do. If overall demand for our products should decrease it
could have a materially adverse affect on our operating results.

Our Trademark and Other Intellectual Property Rights May Not be Adequately
Protected Outside the United States, Resulting in Loss of Revenue.

We believe that our trademarks, whether licensed or owned by us, and
other proprietary rights are important to our success and our competitive
position. In the course of our international expansion, we may, however,
experience conflict with various third parties who acquire or claim ownership
rights in certain trademarks. We cannot assure that the actions we have taken to
establish and protect these trademarks and other proprietary rights will be
adequate to prevent imitation of our products by others or to prevent others
from seeking to block sales of our products as a violation of the trademarks and
proprietary rights of others. Also, we cannot assure you that others will not
assert rights in, or ownership of, trademarks and other proprietary rights of
ours or that we will be able to successfully resolve these types of conflicts to
our satisfaction. In addition, the laws of certain foreign countries may not
protect proprietary rights to the same extent, as do the laws of the United
States.

Risks Relating to Our Current Financing Arrangement:

There Are a Large Number of Shares Underlying Our Secured Convertible Notes and
Warrants That May be Available for Future Sale and the Sale of These Shares May
Depress the Market Price of Our Common Stock.

As of May 2, 2005, we had 33,991,780 shares of common stock issued and outstanding, secured convertible notes outstanding that may be converted into an estimated 60,000,000 shares of common stock at current market prices and outstanding warrants to purchase 10,000,000 shares of common stock. Additionally, we have an obligation to sell secured convertible notes that may be converted into an estimated 90,000,000 shares of common stock at current market prices and issue warrants to purchase 15,000,000 shares of common stock in the near future. Additionally, pursuant to a prior financing with the selling stockholders, we still have outstanding secured convertible notes that may be converted into an estimated 141,294,800 shares of common stock at current market prices and outstanding warrants to purchase 2,250,000 shares of common stock. In addition, the number of shares of common stock issuable upon conversion of the outstanding secured convertible notes may increase if the market price of our stock declines. All of the shares, including all of the shares issuable upon conversion of the secured convertible notes and upon exercise of our warrants, may be sold without restriction. The sale of these shares may adversely affect the market price of our common stock.

The Continuously Adjustable Conversion Price Feature of Our Secured Convertible Notes Could Require Us to Issue a Substantially Greater Number of Shares, Which Will Cause Dilution to Our Existing Stockholders.

Our obligation to issue shares upon conversion of our secured convertible notes is essentially limitless. The following is an example of the amount of shares of our common stock that are issuable, upon conversion of our secured convertible notes (excluding accrued interest), based on market prices 25%, 50% and 75% below the market price, as of May 19, 2005 of $0.02.

| % Below Market | Price Per Share | With Discount at 50% | Number of Shares Issuable |
|------|------|------|------|
| <C> | <C> | <C> | <C> |
| 25% | $.015 | $.0075 | 200,000,000 |
| 50% | $.01 | $.005 | 300,000,000 |
| 75% | $.005 | $.0025 | 600,000,000 |

6

<PAGE>

As illustrated, the number of shares of common stock issuable upon conversion of our secured convertible notes will increase if the market price of our stock declines, which will cause dilution to our existing stockholders.

The Continuously Adjustable Conversion Price Feature of our Secured Convertible Notes May Have a Depressive Effect on the Price of Our Common Stock.

The secured convertible notes are convertible into shares of our common stock at a 50% discount to the trading price of the common stock prior to the conversion. The significant downward pressure on the price of the common stock as the selling stockholders convert and sell material amounts of common stock could have an adverse effect on our stock price. In addition, not only the sale of shares issued upon conversion or exercise of secured convertible notes, series A convertible preferred stock and warrants, but also the mere perception that these sales could occur, may adversely affect the market price of our common stock.

The Issuance of Shares Upon Conversion of the Secured Convertible Notes and Exercise of Outstanding Warrants May Cause Immediate and Substantial Dilution to Our Existing Stockholders.

The issuance of shares upon conversion of the secured convertible notes and exercise of warrants may result in substantial dilution to the interests of other stockholders since the selling stockholders may ultimately convert and sell the full amount issuable on conversion. Although AJW Partners, LLC, AJW Qualified Partners, LLC, AJW Offshore, Ltd., and New Millennium Partners II, LLC may not convert their secured convertible notes and/or exercise their warrants

if such conversion or exercise would cause them to own more than 4.9% of our outstanding common stock, this restriction does not prevent AJW Partners, LLC, AJW Qualified Partners, LLC, AJW Offshore, Ltd., and New Millennium Partners II, LLC from converting and/or exercising some of their holdings and then converting the rest of their holdings. In this way, AJW Partners, LLC, AJW Qualified Partners, LLC, AJW Offshore, Ltd., and New Millennium Partners II, LLC could sell more than this limit while never holding more than this limit. There is no upper limit on the number of shares that may be issued which will have the effect of further diluting the proportionate equity interest and voting power of holders of our common stock, including investors in this offering.

In The Event That Our Stock Price Declines, The Shares Of Common Stock Allocated For Conversion Of The Secured Convertible Notes and Registered Pursuant To This Prospectus May Not Be Adequate And We May Be Required to File A Subsequent Registration Statement Covering Additional Shares. If The Shares We Have Allocated And Are Registering Herewith Are Not Adequate And We Are Required To File An Additional Registration Statement, We May Incur Substantial Costs In Connection Therewith.

Based on our current market price and the potential decrease in our market price as a result of the issuance of shares upon conversion of the secured convertible notes, we have made a good faith estimate as to the amount of shares of common stock that we are required to register and allocate for conversion of the secured convertible notes. Accordingly, we have allocated and registered 150,000,000 shares to cover the conversion of the secured convertible notes. In the event that our stock price decreases, the shares of common stock we have allocated for conversion of the secured convertible notes and are registering hereunder may not be adequate. If the shares we have allocated to the registration statement are not adequate and we are required to file an additional registration statement, we may incur substantial costs in connection with the preparation and filing of such registration statement.

If We Are Required for any Reason to Repay Our Outstanding Secured Convertible Notes, We Would Be Required to Deplete Our Working Capital, If Available, Or Raise Additional Funds. Our Failure to Repay the Secured Convertible Notes, If Required, Could Result in Legal Action Against Us, Which Could Require the Sale of Substantial Assets.

In April 2005, we entered into a Securities Purchase Agreement for the sale of an aggregate of $1,500,000 principal amount of secured convertible notes. The secured convertible notes are due and payable, with 10% interest, three years from the date of issuance, unless sooner converted into shares of our common stock. Although we currently have $600,000 secured convertible notes outstanding, the investors are obligated to purchase additional secured convertible notes in the aggregate of $900,000. In addition, any event of default such as our failure to repay the principal or interest when due, our failure to issue shares of common stock upon conversion by the holder, our failure to timely file a registration statement or have such registration statement declared effective, breach of any covenant, representation or warranty in the Securities Purchase Agreement or related convertible note, the assignment or appointment of a receiver to control a substantial part of our property or business, the filing of a money judgment, writ or similar process against our company in excess of $50,000, the commencement of a bankruptcy, insolvency, reorganization or liquidation proceeding against our company and the delisting of our common stock could require the early repayment of the secured convertible notes, including a default interest rate of 15% on the outstanding principal balance of the notes if the default is not cured with the specified grace period. We anticipate that the full amount of the secured convertible notes will be converted into shares of our common stock, in accordance with the terms of the secured convertible notes. If we were required to repay the secured convertible notes, we would be required to use our limited working capital and raise additional funds. If we were unable to repay the notes when required, the note holders could commence legal action against us and foreclose on all of our assets to recover the amounts due. Any such action would require us to curtail or cease operations.

7

<PAGE>

Risks Relating to Our Common Stock: