# EXHIBIT G

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-KSB

x  ANNUAL REPORT UNDER SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

o  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended: December 31, 2006

Commission file number 000-33415

**CYBERLUX CORPORATION**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Nevada** | **91-2048978** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 4625 Creekstone Drive, Suite 130<br>**Research Triangle Park**<br>Durham, North Carolina<br>(Address of principal executive offices) | **27703**<br>(zip code) |

Issuer's Telephone Number:    (919) 474-9700

Securities registered under Section 12(b) of the Exchange Act:
None

Securities registered under Section 12(g) of the Exchange Act:
Common Stock, $.001 par value
(Title if Class)

Indicate by check mark whether the issuer (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes  x   No  o

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes o   No  x

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-B is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by

The aggregate market value of the Common Stock held by non-affiliates (as affiliates are defined in Rule 12b-2 of the Exchange Act) of the registrant, computed by reference to the average of the high and low price on May 18, 2007, was approximately $1,983,525.

As of May 18, 2007 there were 276,844,639 shares of issuer's common stock outstanding.

Transitional Small Business Disclosure Format (check one): Yes o   No x

**If We Are Unable to Retain the Services of Messrs. Evans, Schmidt or Ringo, or If We Are Unable to Successfully Recruit Qualified Managerial and Sales Personnel Having Experience in Business, We May Not Be Able to Continue Our Operations.**

Our success depends to a significant extent upon the continued service of Mr. Donald F. Evans, our Chief Executive Officer, Mr. Mark D. Schmidt, our President and Mr. John Ringo, our Secretary and Corporate Counsel. Loss of the services of Messrs. Evans, Schmidt or Ringo could have a material adverse effect on our growth, revenues, and prospective business. We do not maintain key-man insurance on the life of Messrs. Evans or Ringo. In addition, in order to successfully implement and manage our business plan, we will be dependent upon, among other things, successfully recruiting qualified managerial and sales personnel having experience in business. Competition for qualified individuals is intense. There can be no assurance that we will be able to find, attract and retain existing employees or that we will be able to find, attract and retain qualified personnel on acceptable terms.

**Many Of Our Competitors Are Larger and Have Greater Financial and Other Resources Than We Do and Those Advantages Could Make It Difficult For Us to Compete With Them.**

The lighting and illumination industry is extremely competitive and includes several companies that have achieved substantially greater market shares than we have, and have longer operating histories, have larger customer bases, and have substantially greater financial, development and marketing resources than we do. If overall demand for our products should decrease it could have a materially adverse affect on our operating results.

**Our Trademark and Other Intellectual Property Rights May Not be Adequately Protected Outside the United States, Resulting in Loss of Revenue.**

We believe that our trademarks, whether licensed or owned by us, and other proprietary rights are important to our success and our competitive position. In the course of our international expansion, we may, however, experience conflict with various third parties who acquire or claim ownership rights in certain trademarks. We cannot assure that the actions we have taken to establish and protect these trademarks and other proprietary rights will be adequate to prevent imitation of our products by others or to prevent others from seeking to block sales of our products as a violation of the trademarks and proprietary rights of others. Also, we cannot assure you that others will not assert rights in, or ownership of, trademarks and other proprietary rights of ours or that we will be able to successfully resolve these types of conflicts to our satisfaction. In addition, the laws of certain foreign countries may not protect proprietary rights to the same extent, as do the laws of the United States.

<u>Risks Relating to Our Current Financing Arrangement</u>:

**There Are a Large Number of Shares Underlying Our Secured Convertible Notes and Warrants That May be Available for Future Sale and the Sale of These Shares May Depress the Market Price of Our Common Stock.**

As of May 18, 2007, we had 276,844,639 shares of common stock issued and outstanding, secured convertible notes outstanding pursuant to our securities purchase agreements dated April 22, 2005, October 24, 2005, December 28, 2005, March 27, 2006, July 27, 2006, September 26, 2006, December 20, 2006, April 18, 2007 and May 3, 2007 that may be converted into an estimated 763,521,303, 457,142,858, 400,000,000, 285,714,286, 285,714,286, 160,000,000, 342,857,143, 228,571,429 and 85,714,286 shares of common stock at current market prices, respectively, and outstanding warrants pursuant to our securities purchase agreements dated April 22, 2005, October 24, 2005, December 28, 2005, March 27, 2006, July 27, 2006, September 26, 2006, December 20, 2006, April 18, 2007 and May 3, 2007, to purchase 2,250,000, 25,000,000, 800,000, 700,000, 19,000,000, 15,000,000, 10,000,000, 700,000, 10,000,000 and 10,000,000 shares of common stock, respectively. In addition, the number of shares of common stock issuable upon conversion of the outstanding secured convertible notes issued pursuant to the securities purchase agreements dated September 23, 2004, April 22, 2005, October 24, 2005, December 28, 2005, March 27, 2006, July 27, 2006, September 26, 2006, December 20, 2006, April 18, 2007 and May 3, 2007 may increase if the market price of our stock declines. All of the shares, including all of the shares issuable upon conversion of the secured convertible notes and upon exercise of our warrants, may be sold without restriction. The sale of

these shares may adversely affect the market price of our common stock.

30

**The Continuously Adjustable Conversion Price Feature of Our Secured Convertible Notes Could Require Us to Issue a Substantially Greater Number of Shares, Which Will Cause Dilution to Our Existing Stockholders.**

Our obligation to issue shares upon conversion of our secured convertible notes is essentially limitless. The following is an example of the amount of shares of our common stock that are issuable, upon conversion of our secured convertible notes (excluding accrued interest), based on market prices 25%, 50% and 75% below the market price, as of May 17, 2007 of $0.008.

| % Below Market | Price Per Share | With Discount at 75% | Number of Shares Issuable | % of Outstanding Stock |
|---|---|---|---|---|
| 25% | $ .006 | $ .0015 | 3,510,774,854 | 92.69% |
| 50% | $ .004 | $ .001 | 5,266,162,280 | 95.01% |
| 75% | $ .002 | $ .0005 | 10,532,324,560 | 97.44% |

As illustrated, the number of shares of common stock issuable upon conversion of our secured convertible notes will increase if the market price of our stock declines, which will cause dilution to our existing stockholders.

**The Continuously Adjustable Conversion Price Feature of our Secured Convertible Notes May Have a Depressive Effect on the Price of Our Common Stock.**

The secured convertible notes issued in April 22, 2005, October 24, 2005, December 28, 2005, March 27, 2006, July 27, 2006, September 26, 2006, December 20, 2006, April 18, 2007 and May 3, 2007 are convertible into shares of our common stock at a 75% discount to the trading price of the common stock prior to the conversion. The significant downward pressure on the price of the common stock as the selling stockholders convert and sell material amounts of common stock could have an adverse effect on our stock price. In addition, not only the sale of shares issued upon conversion or exercise of secured convertible notes, series B convertible preferred stock and warrants, but also the mere perception that these sales could occur, may adversely affect the market price of the common stock.

**The Issuance of Shares Upon Conversion of the Secured Convertible Notes and Exercise of Outstanding Warrants May Cause Immediate and Substantial Dilution to Our Existing Stockholders.**

The issuance of shares upon conversion of the secured convertible notes and exercise of warrants may result in substantial dilution to the interests of other stockholders since the selling stockholders may ultimately convert and sell the full amount issuable on conversion. Although AJW Partners, LLC, AJW Qualified Partners, LLC, AJW Offshore, Ltd., and New Millennium Partners II, LLC may not convert their secured convertible notes and/or exercise their warrants if such conversion or exercise would cause them to own more than 4.9% of our outstanding common stock, this restriction does not prevent AJW Partners, LLC, AJW Qualified Partners, LLC, AJW Offshore, Ltd., and New Millennium Partners II, LLC from converting and/or exercising some of their holdings and then converting the rest of their holdings. In this way, AJW Partners, LLC, AJW Qualified Partners, LLC, AJW Offshore, Ltd., and New Millennium Partners II, LLC could sell more than this limit while never holding more than this limit. There is no upper limit on the number of shares that may be issued which will have the effect of further diluting the proportionate equity interest and voting power of holders of our common stock, including investors in this offering.

**If We Are Required for any Reason to Repay Our Outstanding Secured Convertible Notes, We Would Be Required to Deplete Our Working Capital, If Available, Or Raise Additional Funds. Our Failure to Repay the Secured Convertible Notes, If Required, Could Result in Legal Action Against Us, Which Could Require the Sale of Substantial Assets.**

Between 2004 and 2007, we entered into Securities Purchase Agreements for the sale of an aggregate of $6,930,000

principal amount of secured convertible notes, of which $5,266,162.28 remains outstanding. The secured convertible notes are due and payable, with interest, between two and three years from the date of issuance (or the date from which we are in compliance with the terms of the securities purchase agreements), unless sooner converted into shares of our common stock. In addition, any event of default such as our failure to repay the principal or interest when due, our failure to issue shares of common stock upon conversion by the holder, our failure to timely file a registration statement or have such registration statement declared effective, breach of any covenant, representation or warranty in the Securities Purchase Agreements or related convertible note, the assignment or appointment of a receiver to control a substantial part of our property or business, the filing of a money judgment, writ or similar process against our company in excess of $50,000, the commencement of a bankruptcy, insolvency, reorganization or liquidation proceeding against our company and the delisting of our common stock could require the early repayment of the secured convertible notes, including a default interest rate of 15% on the outstanding principal balance of the notes if the default is not cured with the specified grace period. We anticipate that the full amount of the secured convertible notes will be converted into shares of our common stock, in accordance with the terms of the secured convertible notes. If we are required to repay the secured convertible notes, we would be required to use our limited working capital and raise additional funds. If we were unable to repay the notes when required, the note holders could commence legal action against us and foreclose on all of our assets to recover the amounts due. Any such action would require us to curtail or cease operations.

31

## CYBERLUX CORPORATION
## CONSOLIDATED STATEMENTS OF OPERATIONS
## YEARS ENDED DECEMBER 31, 2006 AND 2005

|  | 2006 | 2005 |
|---|---:|---:|
| Net Sales | $ 484,988 | $ 54,523 |
| Cost of goods sold | (377,524) | (235,768) |
| Gross margin (loss) | 107,464 | (181,245) |
| | | |
| OPERATING EXPENSES: | | |
| Impairment Loss | - | 30,544 |
| Depreciation and amortization | 23,360 | 25,769 |
| Research and development | 225,770 | 499,618 |
| General and administrative expenses | 5,027,760 | 2,355,830 |
| Total operating expenses | 5,276,890 | 2,911,761 |
| | | |
| NET LOSS FROM OPERATIONS | (5,169,426) | (3,093,006) |
| | | |
| Other income/(expense) | | |
| Unrealized gain (loss) relating to adjustment of derivative and warrant liability to fair value of underlying securities | 953,719 | (4,485,654) |
| Interest income | 92 | 349 |
| Debt forgiveness | 36,799 | - |
| Interest expense | (2,585,800) | (1,623,781) |
| Debt acquisition costs | (10,784) | (208,565) |
| | | |
| Net loss before provision for income taxes | (6,775,400) | (9,410,657) |
| | | |
| Income taxes (benefit) | - | - |
| | | |
| LOSS AVAILABLE TO COMMON STOCKHOLDERS | $ (6,775,400) | $ (9,410,657) |
| | | |
| Weighted average number of common shares outstanding-basic and assuming fully diluted | 94,515,133 | 54,490,102 |
| | | |
| Loss per share - basic and assuming fully diluted | $ (0.07) | $ (0.17) |
| | | |
| Preferred dividend | $ 96,000 | $ 96,000 |

**The accompanying notes are an integral part of these consolidated financial statements**

F-3